Whenever you're ready. May it please the Court. Waley Shaw for the United States. The question presented is whether a contract for tasks like dishwashing and mopping floors is a contract to operate a cafeteria within the meaning of the Randolph-Shepard Act. Now, under the plain meaning of the word operate, the answer is clearly no. The Army operates these cafeterias. It plans the menu, it orders the food, manages inventory, prepares and serves the food, and performs head count and collects payment. The contract under this proposal performs only those discrete custodial services that Army regulations specifically prohibit soldiers from doing. Now, Congress could have drafted a much broader statute. It could have drafted a statute that gives preference to any blind vendor who performs any services pertaining to a cafeteria, but it didn't do that. Congress said operate a vending facility, and it is a cardinal rule of statutory interpretation that Congress means what it says. The panel majority largely accepted this version, and then the district court ruled against you, correct? That's right. That's correct. And am I correct that there's a pending case in the Fourth Circuit that has the flip, that the panel ruled against you, but the district court, Judge Ellis, ruled in your favor? I think that's correct. And that's been briefed? Are you involved in that case at all? No, I'm not involved in this case. The attorney who originally briefed this case is on leave, so I'm arguing in her place. That case briefed or submitted no oral argument or waiting for the Fourth Circuit to rule? That's right. No argument has been scheduled as far as I'm aware. And I just want to add that plaintiff's interpretation has no principled limit. Now, just as every cafeteria needs sanitation services to safely serve food, every cafeteria also needs to keep food cold. So a contract to provide and maintain refrigeration units for a cafeteria or to maintain the vent hoods that allow safe preparation of the food, that would also constitute operating a cafeteria within the meaning of the Randolph-Shepard Act. Yet no one would argue that the Randolph-Shepard Act covers all of these discrete services. And our interpretation of the word operate is supported by both dictionary definitions and by precedent of both the Supreme Court and this Court. So, for example, I would point the Court to the Supreme Court's decision in Best Foods in which it says that the word operate ordinarily means to conduct the affairs of or to manage, as in to operate a business. And then it goes on to say that the term operation must be read to include the exercise of direction over the facility's activity. That's in the context of CERCLA, is that right? That is a CERCLA case. Is there a case, or maybe I should ask you what is your best case, that expounds upon the meaning of the word operate closer to something such as this statute? I'm not aware. I think that I'm not aware of any. There are some district court cases and court of federal claims cases that have considered sort of the precise question, the meaning of the term operate within this statute, but I'm not aware of any court of appeals precedent or Supreme Court precedent that does so. But I would submit that there's no reason to not rely on the interpretation that the Supreme Court relied on in Best Foods, notwithstanding that it obviously pertains to a different statute. It relies on the dictionary definition of operate in a sort of organizational sense that clearly would also obtain here. In the case you cited from our circuit, Nature's Way, that had to do with operating a tugboat. That's right. It just seems very distant than how you operate a vending machine. Well, I'm not. I can't really. I guess I had two difficulties. Well, three. One was the plain meaning operation means the working of, and the people who provide the food don't seem to be any more or less essential than the people who remove and clean up the food. Right, but I think the point is that it cannot be the case that anyone who is essential to the overall working of the cafeteria is operating the cafeteria. So it can't be, for example, that the person who, again, maintains the refrigerators or does the pest control, all of which are essential, are also considered to operate the cafeteria. That seems to be your strongest argument, that what's the limit to their argument. But in many ways, the interpretation that the government is offering is the much more stark one. It's either in or out in terms of you either manage it and provide food or you aren't covered. I guess what I got confused about is what's the determinative rule for you? Is it the managerial level or is it the providing of food? Which of the two is it? I think both of those are potential criteria this court could rely on, but here we're arguing most. I think the easiest way to resolve this case is to rely on the management aspect of it, and that is a sense of the word operate that is clearly expounded on, again, by dictionary definitions. But if it were management level, then it wouldn't include the people who are cooking the food, right? The Army manages in all circumstances. Right, and I don't know that I would say that a line cook is operating the cafeteria. The Army is responsible for the overall operations and management. But doesn't that just mean there will never be blind vendors because you've got Army personnel that manage, and your rule says that only managers are governed by the Randolph-Shepard Act, therefore really what we mean is nobody is going to get these priority contracts. I don't think that's correct, Your Honor. I would actually point out that in a full food service contract, it's quite clear under the Army's regulations and actually in the actual full food service contract that's in the record that the contractor is responsible for management of the operation of the cafeteria, notwithstanding, obviously, that in any contract the contracting agency will maintain a level of supervision over the contract as a whole. But in terms of the specific activities that a full food service vendor is required to provide, and I can refer you directly to the Army's regulations, and these are in the record on appeal at page 182. Those are Army regulations that define a full food service contract as contracts that cover those activities that comprise the full operation of an Army dining facility. It includes but is not limited to requisitioning, receiving, storing, preparing, and serving of food. Also included is the performance of related administrative, custodial, and sanitation. How is serving food? How can that not contemplate giving people the trays and giving them the silverware? That seems to me, to use the district court's word, that's integral to serving food. I guess, again, I want to distinguish between something that's integral to the operation, to the performance of what a cafeteria needs to do, and the supervision, the management, in the sense contemplated by Best Foods, of that cafeteria itself. So someone who is determining what food will be served, is determining what food will be ordered, will actually have an influence on the quality of the food. That is someone who is managing a cafeteria. Someone who is doing a single discrete or a set of discrete tasks that have been carved out from the overall activities. But that's why the appeals panel, the district court said the appeals panel was contrary to law, was that it didn't allow for flexibility case-by-case analysis. We look and see, is this discrete, pulling the chairs in, opening the doors? Those aren't covered. Or is this sort of essential to providing food? Those are covered. I don't think that we have any problem with the case-by-case analysis. I think it makes sense for the court to look at the actual activities that are contemplated by the contract and determine whether that means those activities constitute operating a cafeteria within the meaning of the act. And operating equals managing. That's the bottom line from your argument. Yes, and managing, and clearly if you think of the term manage, it contemplates the exercise of discretion over a meaningful part of the facility's activities, and not just a single or a single set one type of task that is at best a support service to the overall purpose of that facility. What motivated the Army to split the contract into two? What was the purpose behind it? You know, it's not entirely clear from the record what the purpose of that was. I think there's some indication that there was a belief that the Army should do so to comply with the Competition and Contracting Act, which has various provisions that discourage the bundling of different contracts into one in a way that would make it difficult, for example, for a small business to bid on those contracts. But that is not entirely clear from the record why the Army did so. Did the splitting of the contracts need to be justified by the Secretary? That is an issue that the plaintiff did argue before the arbitration panel. Now, the arbitration panel never ruled on that question, and the district court did not pass on it either. So we do not disagree with the plaintiff that even if this court were to agree with the government, that it would be appropriate to remand or direct the district court to remand the case to the arbitration panel to consider that question in the first instance. So you wouldn't object to that? No, we don't object to that. Isn't that a threshold issue? Why did they do it? Did they split it up to limit it? And isn't that a preliminary issue to whether the contract is covered? I noticed in the district court in Eastern Virginia addressed both issues. Right. I'm not sure that I would characterize one as a threshold and the other as not. I mean, I think they're both questions of compliance with the Randolph-Shepard Act. There's a question of whether the Army has complied with the requirement to give a preference to a blind vendor that operates a vending facility, and there's a question as to whether the Army was required to submit the division of the contracts to the Secretary of Education in advance. And those are sort of two distinct requirements. When you answered Judge Engelhardt's question earlier, there isn't a circuit out there that has really pronounced on the meaning of the word operate in this statute. No, not that I'm aware of. And yet this preference system applies to pretty much all federal government facilities, correct? So this will be a very consequential ruling. Well, I should just point out that it is true that the Randolph-Shepard Act applies across the federal government, but the particular type of situation that we have here, as far as I'm aware, is unique to the military in that it is, as far as I'm aware, the military is the only part of the government that has these types of contracts where soldiers are responsible for performing the bulk of the tasks relating to the cafeteria, including management and food service. So what happens in Article III courthouse cafeterias? Is it all preference? That's governed? All of them are governed because they don't do it the way the Army does it? Right. I'm not aware of the sort of precise details of how Article III cafeterias work, but I think the general model is that the cafeteria is contract or operated. So when the government solicits a contract to operate a cafeteria, they solicit all the functions that would be included in the full first. Including the materials, so the whole thing is given to the... Exactly, much like in the full food service contract in the Army regulations. That makes it more essential, Judge Clement's question, is why is the military doing it differently than every other federal government property? Well, I think there is an important reason why the military does it this way, which is that they want the soldiers to be able to have the responsibility to manage and prepare the food in the cafeteria. There are soldiers who go to school for this type of thing who are trained in this. And in particular, I think at Fort Bliss, there have been many soldiers that have been returning from abroad. I saw that in the briefs, but why not get Congress to exempt them then? If everyone else is interpreting the statute differently and the military wants to deal with returning service people, which is commendable, you probably should go back and get Congress to clarify. I'm not aware of... Well, I should just say that there have often been discussions regarding legislative proposals. I'm not aware of the details of those proposals, but I would just want to dispute the characterization that other parts of the government interpret the Randolph-Shepard Act differently. I think the government as a whole agrees that where a contractor is responsible for managing the entire cafeteria and operating the entire cafeteria, that that is a contract that's subject to the Randolph-Shepard Act. The question is, in this unique type of situation, which only exists in the military, where soldiers perform the bulk of the operation and management of the cafeteria but they hire a vendor to perform discrete tasks such as janitorial and support sanitation services, whether that also comes under the coverage of the Randolph-Shepard Act. Counsel, is it possible that the breadth of the word operate is different depending on what statutory context it's used? I guess I'm going back full circle to our... You mentioned the case, the Best Foods case. I'm looking at the statute here, and under purpose it says, the purpose of this chapter, to empower individuals with disabilities to maximize employment, economic self-sufficiency, and so on. Subsection 2, to maximize opportunities. Subsection 4, to increase employment opportunities and employment outcomes for individuals with disabilities. Would that give us some insight as to use of the word operate in this context, or is it the government's position that all we need to do is go to the Webster's or Take Your Pick, Flax, whichever it is, common use of the word operate and it would remain consistent? May I answer? Yes, of course. I would certainly agree that Congress sought to provide opportunities to blind vendors, but it didn't seek to do so across all possible types of services that the government needs. And, in fact, there are statutes that do that. For example, the Javits-Wagner-O'Day Act, which is referenced in the briefs, also provides a preference for the blind and severely disabled, but that's a much broader statute that covers all types of goods and services, including the dining facility attendance services covered here, but also many other types of goods and services. So Congress, yes, it did seek to provide these types of opportunities, but it sought to do so within a discreetly limited category of functions, which is operating a vending facility. And I should also point out that there are indications in the statute and in the regulations that support the limitation that we propose here. Those are in your brief, and you do have rebuttal time. Thank you. Thank you, Counselor. Mr. Nolan? May it please the Court. I'm Peter Nolan, and I represent the State of Texas in all of its efforts to enlarge economic opportunities for the blind. The Army's relatively new policy of narrowly construing the application of the Randolph-Shepard Act to exclude all DFA contracts to the detriment of the Texas blind vendor in this case was for the stated purpose in the record of helping small businesses acquire those contracts. That was the stated purpose in the record. That's on page 749. And this is kind of a familiar pattern. I cite to the Senate report from 1974 that was issued by Senator Randolph as to why you had to have amendments in 1974 to the Randolph-Shepard Act. And here was the explanation. It said that the 1974 amendments were required because contrary to the spirit of the Act, which strives to encourage the establishment and growth of blind entrepreneurs, certain agencies construed the Act narrowly to the detriment of blind vendors. Specifically, minority enterprises were given preference over blind vendors in contravention of the intent of the Act, and specifically, commanders of military installations are singularly insensitive to the need to develop the program. And what's important is to remedy these types of abuses, which is what happened here. Congress directed the Secretary of Education review and determine the propriety of such federal agency limitations on the operation of a blind vending facility. And that determination is binding. That's in 107B. That is binding even on insensitive commanders of military installations. The Secretary of Education has now reviewed and determined that the Army's narrow construction of the Act to preclude its application to these DFA contracts was unjustified and violated the Act. The district court, in its Rule 59 denial, didn't give deference to that DOE letter, correct? It did. It acknowledged it for persuasive value? Yes, Your Honor. It didn't give it Chevron deference. But isn't the issue before us whether or not the arbitration panel majority was arbitrary and capricious, and therefore isn't it fair to think, well, it was rational to say that the verb operate means run the show, and therefore their managerial limitation is a rational interpretation of that verb? I don't think so, and the district court didn't think so. He said, look, they didn't really find any facts. They didn't care about the facts. They just said the Randolph-Shepard Act doesn't apply to DFA contracts. And that's an issue of law, to which the district court addressed that de novo. And your rule would say you have to do what the panel dissent did? No. In other words, he just said up here he doesn't mind a case-by-case analysis of each contract, and yet the district court said that's what hadn't been done. That's right. That had not been done, and we agree with the district court that it takes a case-by-case analysis of each contract to determine that. And then what's your limiting principle then? In other words, the person who opens the doors, the person that moves the chairs around, where do you stop? In other words, it's not pertinent to running a cafeteria or part or ancillary of. It has to be essential to? Yes. In fact, the Army's argument about that you have to operate everything is a red herring, and they've never done that. The unrefuted evidence at the hearing was that for decades, the Army, the Navy, the Air Force, everybody within the Department of Defense has operated these contracts jointly, with the military installation having the overall responsibility and then a civilian contractor doing various levels of service. This is applied to both those full food service contracts and the DFA contracts. And the Department of Defense makes clear that in a contract, and in fact that occurred at Fort Bliss, where it's predominantly a DFA contract, but let's say there's some limited food preparation. That's the only difference between it and a pure DFA contract. Then that has the management responsibilities that the DoD is looking for, and that is treated as a contract which is subject to the Randolph-Shepard Act. So a DFA contract with potato peelers is subject to the Randolph-Shepard Act. But the DoD says a DFA contract without potato peelers is not, and that really doesn't make a lot of sense. I didn't hear him say even the potato peelers would be covered. I thought it really had to be supervisory level only. In the, I think it's page 1772 of the record, we have a Department of Defense IG report where it lays this out and says if a contract, a DFA contract, has even a contingency for a potato peeler, it will be treated as subject to the Randolph-Shepard Act. So it's never been about providing all the services. I think the district court got it right. It's look at what services are provided. And in that regard, if you look on page 1772, the Department of Defense says there are two types of military dining facilities contracts, not refrigeration, not bug spray, two types of military dining facilities contracts. One is the full food service. The second is the DFA. So even the Department of Defense for decades has recognized that a DFA contract is a contract for the operation of a cafeteria. That's how it's labeled. Which would mean food handling. So if the potato peeler is handling food, it's the same as being a cook, right, preparing the food, not cleaning up the dishes. Right, and then we say the food handling is a misdirection. The food handling is no more essential to it than making sure that the pot in which you cook is clean or the tables are clean. In fact, all of these employees of a DFA contract have to have the food handling certification because they are charged with the same things that the cooks are, making sure the troops get fed clean, nutritious food. And so I think what I'd like to focus on is that level of executory function. That's what we think the test is. We agree the act does not define operate. The congressional directives are not clear. The court cases are not clear. They've gone on both sides. Tribunals have gone both ways. So what the trial court found was that the statute was ambiguous. It doesn't clearly state what operate means. And so the trial court properly looked at the secretary's opinion on this exact issue. And I recently said that I was going to use a case that was not cited in the brief, and that's the Nation's Bank of North Carolina versus Variable Annuity Life Insurance Company. And that's the case that stands for the Supreme Court case. And that's the case which stands for this. That's not a new case. Did I cite it in my brief? Is this the 28-J letter you sent us? Yes. I'm sorry. It was new. It doesn't qualify as the 28-J. Oh, but I hadn't cited it in my brief, so I wanted to provide notice to everyone that I was going to use it, and I thought I had to do it to the 28-J. But anyway, the Nation's case stands for this proposition. It is well settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement, not just the administration, but charged with the enforcement of that statute. And the Secretary of Education, and I was with the comptroller, was charged with enforcement of the statute in the Nation's Bank case, but the Secretary of Education is similarly charged with enforcement of the Randolph-Shepard Act by the section we talked about, section 107, open parentheses, little b, close parentheses, as she is charged with reviewing and determining whether a limitation on the operation of a cafeteria contract, like the one we have here, has been justified by the Army. Her determination in her letter that the Army's narrow interpretation of the Act to exclude the priority of the Randolph-Shepard Act from DFA contracts, like the one at Fort Bliss, was a violation of the Act, should be given Chevron deference, according to the Nation's Bank. And that's because Congress said, and this is on page, I think... But this is sort of inviting a more difficult issue. I think the concern is, just from advocacy standpoint, it's difficult to file a 28-J letter saying a new development as to a case that precedes the date of your brief. But you found it, you thought it was relevant. Here's my question to you. I thought the district court here, in denying the Rule 59 motion, said I'm not relying on Chevron or Skidmore deference at all. That's not what I'm doing here. I'm just finding it's ambiguous, and when I look around at the various canons of construction, I conclude it has to be case by case. It can't be this managerial rule or not. I thought the district didn't... I believe the district court said it was not entitled to Chevron, but it was entitled to Skidmore. Okay. I'm just suggesting to you that gets into a much more complicated area. It isn't clear to me that's essential to your argument. But you go ahead and argue it though you want. Could you interpret the panel's dissent for me? I had a hard time deciphering it. It's in your favor, but did the panel dissenter agree?  I had a little trouble with the panel's dissent too, and I'm much better able to explain the court's reasoning than the panel's dissent. What about Judge Ellis's ruling opposite to you in the Eastern District of Virginia? Have you seen that ruling? I have seen that. I argued that case. Oh, you argued it. Okay. So am I right? The briefs are submitted. Are they going to have oral argument, or is it just waiting? There is going to be oral argument. It hasn't been scheduled yet. I see. So they're a little behind us. Yes, they are. Okay. So where did Judge Ellis go wrong then? Because did he take the position that the Army is urging now? He took the position that he was not going to give any credence to the Secretary's letter. Okay. And then he said, I agree that basically what the Army has said, you've got to manage the whole thing even though also in that case, in the Fourth Circuit case at Fort Riley, the contract that the blind manager was managing was essentially a DFA contract with some potato peeling. And the Army said, that's a Randolph Shepard case. But once we take out potato peeling, it's not a Randolph. It was that clean. Even with that, he basically said, well, I'm not worried about that. And there was an interesting interchange where he chewed out the DOJ lawyer for suggesting that he should not give great weight to the Secretary of Education because she had weighed in on the exact issue. And he said, I want you to take this transcript back to your boss and show it to him. That's a stupid argument. And yet by the time he wrote his opinion, he said something else. But he basically went with what the Army said. Which is that the verb operate means essentially run the show. And therefore whether you get a potato peeler sounds pretty low down. That's not running the show. So potato peeler, you're saying to us, is irrelevant, whether it's got a little bit of food in or food out. The key is you only get the preference for blind vendors if they run the whole show. That's what the Army is saying. But then my difficulty with that, you heard me ask him, is I thought the Army always runs their own show. The Army always does have overall management. So the Act only applies to a second level of management? Well, as the case that was cited by the government in this case, and I cited it in our brief, it's the Ernst and Young case, which talks about joint operations. So you can be say to operate something if you jointly operate it. And on page 1772 of the transcript, that's where the Department of Defense describes how all of these contracts are jointly operated by the military and by the civilian contractor. And so I think it's Reeves and Ernst versus Reeves, but that's cited by the government and by us, stands for the proposition that that was a RICO case, that enterprises can be jointly operated by more than one entity. And that's exactly what went on here and that's exactly what the Secretary of Education found and that's exactly what the judge found. Because these two entities are jointly operating this contract, then the Randolph-Shepard Act applies to these DFA contracts. And the purpose of the Randolph-Shepard Act, I think you pointed this out, is to enlarge economic opportunities for the blind. It's not to look for ways to get rid of the blind manager. So what happened in this case? There were six cafeterias being operated by a blind manager, and the Army set out to winnow those down as much as they could. In the transcript, the only reason given to divide that contract in two was to get rid of the blind manager on four of the contracts. That was the only reason given. And to make sure that they got rid of the blind manager, those contracts historically had been predominantly DFA with some potato peeling. And to get rid of the blind manager, they scrubbed the contracts clean of the potato peeling to make sure that they could say, well, under our interpretation, Randolph-Shepard doesn't apply to DFA. We don't care what kind of management you have. There's no override in the statute in flexibility if it truly is returning troops from Afghanistan that RSA still precludes them from doing the tasks you're describing? That's right. There is a statute which precludes them. I actually peeled potatoes at Fort Riley in the early 70s. It's not good for morale. And so Congress similarly has said there are certain tasks which we're not going to have troops do, and so there's always a civilian contractor to do basically those sanitation tasks. Potato peeling can go on either side. It can go with the sanitation task or without. But that's why there are always joint operations. Half of the work is being done, and not just done, but done and managed. So the contract is full of the management of this cafeteria contract. The performance work statement states, this contract includes all functions, tasks, and responsibilities normally performed by a food service operation. It is for the management of this operation. The performance work statement contains a requirement that the contractor hire management and supervisory personnel to manage their operations of the cafeteria contract. The Army people who testified, Russell Campbell testified. He was the Army Sustainment Command Food Program Manager. He testified that services in a DFA contract cover a portion of the operation of a cafeteria, and the DFA services are an inherent part of the operation of a cafeteria. That's why these are classified as dining facilities contracts. The solicitation in this case includes management and tasks that are integral and necessary to the operation of the Fort Bliss cafeteria. And I want to point something else out. What the Army did was cut off its nose despite the blind vendor. So the unrefuted testimony at the hearing was that dividing this one contract into two contracts would cost the Army more money. His core principle, though, just is we look at Supreme Court case law, best foods. We look at Fifth Circuit case law, nature's way, and operate means this high level of supervision. So do you want to respond to those cases that he's urging us to follow? Yes. For instance, the Ernst v. Reeves case, also Supreme Court, also says, look, you can jointly operate something. So, yes, operate does require a high level of supervision, which we have here. I just read it from the performance work statement. It requires a high level of supervision on both sides of the cafeteria contract. It requires it from the Army when they're managing the cooking and from the contractor when they're managing the sanitation and the cleaning and all the other things. So we're not disputing that it requires a high level of supervision, and the transcript provides that high level of supervision, which was required in this dining facilities contract. So, again, the threshold question seems to me, why did they split the contracts? Because if they keep sub-splitting, at some point they can write a contract for bug spray, and you wouldn't claim that that fits into Randall Shepard, correct? Nor do I think bug spray is part of the contract. I know it's not, but my point is, I guess I'm back to isn't this why they did it and the limiting issue preliminary to us deciding the vast question of what does operate mean? They said why they did it. They did it to get rid of the blind vendor. That's why they did it. But he just stood up and said they did it to accommodate returning troops that don't have enough tasks to do. But he didn't cite to you a page in the record. The record said why they did it. I asked, can you think of any other reason to do this other than to, and I didn't say to get rid of the blind vendor. I said to give other contractors an opportunity at a contract for which the blind vendor can't even bid, and the answer was yes. I translated that to get rid of the blind vendor, because the blind vendor can't even bid on the DFA contract. They made it a small business set-aside. He couldn't even bid. They said it's not subject to the Randall Shepard Act. So they did it for the purpose of getting rid of the blind vendor, even though the record is clear that it cost them more money, even though the record is clear that by taking the potato peeling out of the DFA contracts and making the Army do it, that that was detrimental to morale. Counsel, thank you for the argument. We have rebuttal time. Thank you. I think it's important to clear up some confusion that may have arisen from the briefs, and in particular to the citation to Department of Defense Inspector General report that sort of generalizes about how dining facility contracts work across the military. Now, the term dining facility attendant is used, or mess attendant is used across different branches of the military, and it can mean different things in different branches. And I think that's why the IG report says some things that actually aren't actually true about the particular contracts at issue here or about the military regulations. So I would strongly encourage the court to look to the specific solicitation at issue here and to the performance work statement and look at the actual activities that are described. And also to the Army regulations, which are quite clear that the full food service contractor, in fact, does exercise management, decides what's going to be on the menu, decides how much food should be ordered, decides how much inventory to be maintained, and so forth. It actually has all of those management responsibilities, which a DFA contractor in the Army does not, either under the Army's regulations or under the terms of the specific solicitation here. Now, opposing counsel has cited to some general provisions that talk about management or about, you know, you need to have a supervisor. And I just want to carefully distinguish between managing a cafeteria and managing the contractor's own performance of the tasks that they are required to do. A refrigeration maintenance contractor needs to manage their employees to make sure that they show up on time and do the things that they're supposed to do. That doesn't mean that the refrigeration maintenance contractor is operating the cafeteria. But this statute doesn't just apply to big cafeterias. It applies explicitly to vending machines, and those are all over the place. Right, that's right. How would we have a manager? Wouldn't the person who stocks the vending machine be covered by the act? Yes or no? Yes. I think in the typical vending facility... That's not a big manager. That's just someone putting... Right. Well, the person who is in charge of that vending machine is responsible for managing that vending machine. It's a much smaller responsibility than managing a cafeteria, but someone still has to decide, you know, what goes in the vending machine, how much are you going to charge? You know, the equivalent types of decisions are obviously taken at a much lower level. That doesn't mean that someone who is hired merely to wipe the glass of the vending machine is now operating that vending machine as opposed to the person who actually is the one who... The proposing counsel says there are no such tiny, minuscule contracts. This is an artificial distinction because the Army doesn't have bug spray contracts. They just have these big, single contracts. Is that wrong? A big, single contract to operate the entire cafeteria would be covered under the Randolph-Shepard Act. The problem is when you carve out discrete support services, that does not come within the meaning of the term operate a cafeteria. So, again, someone who is responsible for maintaining the vent hood, right? That is... There are contractors who do those sorts of things, and that would not constitute operating a cafeteria. I would also strongly, strongly dispute the opposing counsel's characterization of the Army as trying to kick out the blind vendor. Clearly, the blind vendor continues... continues to be able to operate the two full food service facilities on the base. And the fact that there are other statutory preferences enacted by Congress for different types of businesses, including, for example, small businesses or blind and severely disabled people under the Javits-Wagner-O'Day Act, to sort of comply with those other statutory preferences is not to kick out a blind vendor or to have some sort of animus towards... Do you have a record cite that the reason they had to subdivide was because accommodate returning troops? Unfortunately, I don't have the citation here, but there are some e-mails in the record, again, which, unfortunately, I don't have the page numbers here, but that actually do discuss the reasons for splitting up the contracts. So, finally, I want to dispute the characterization that the Secretary of Education has found that the particular contracts at issue here or in the Kansas case are unjustified and not in compliance with the Randolph-Shepard Act. And I would point the court... This is cited in our briefs. This issue came up in the Source America litigation in the district court, where the district court asked the DOJ to ask the Secretary of Education for her position. And what the department reported in that case is that the Department of Justice has asked DOE... I'm sorry, the Education Department to state whether, apart from this litigation, the Department of Education has adopted any position on the correctness of the Kansas arbitration decision or the application of the Randolph-Shepard Act to the Dining Facility Attendant Services at Fort Riley. The Department of Education, through General Counsel Carlos G. Munez, advised the Department of Justice that apart from this litigation, the Department of Education has not adopted any position on those matters, and more specifically, the Secretary's March 5, 2018 letter did not adopt any such position. Okay. Thank you, counsel. We appreciate the cases submitted.